Jonathan **SHAYWITZ**, Plaintiff,

v.

**AMERICAN BOARD OF PSYCHI-ATRY AND NEUROLOGY,**
Defendant.

**No. 09 Civ. 4387(VM).**

United States District Court,
S.D. New York.

Dec. 17, 2009.

David Boies, II, Boies, Schiller & Flexner LLP, Armonk, NY, Philip M. Bowman, Boies, Schiller & Flexner, LLP, New York, NY, for Plaintiff.

Gurbir Singh Grewal, Howrey LLP, New York, NY, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Jonathan Shaywitz ("Shaywitz") brought this action, naming the American Board of Psychiatry and Neurology (the "Board") as defendant. Shaywitz asserts three causes of action, the first under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12189, and the second and third under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, respectively. The Board now moves to dismiss Shaywitz's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for lack of subject matter jurisdiction and 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

### I. BACKGROUND

### A. SHAYWITZ AND HIS DISABILITY [1]

Shaywitz asserts that he is a licensed physician and exceptionally well-qualified psychiatrist. He graduated from Harvard

---

1. The facts below are taken from the Complaint, dated May 6, 2009 (the "Complaint" or "Compl."), and the documents attached to it or incorporated by reference. The Court accepts these facts as true for the purposes of ruling on a motion to dismiss. *See Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 180 (2d Cir.2008). Except where specifically referenced, no further citation to these sources will be made.

Medical School and completed his residency and fellowship in psychiatry at the UCLA Neuropsychiatric Institute. He has received consistent high praise from his teachers and colleagues. For example, in an evaluation of Shaywitz at Harvard Medical School, his psychiatric preceptor stated that "[i]n the fifteen years that I have taught and supervised HMS medical students and, in recent years, served as Director of the Child Psychiatry component of the McLean clerkship, [Shaywitz] ranks in the top 1%." Shaywitz has excelled academically and professionally despite being dyslexic and suffering from two conditions (extreme anxiety and arrhythmias) that exacerbate the harm caused by his dyslexia.

Shaywitz was diagnosed with dyslexia, a neurologically-based, life-long learning disability, during elementary school and continues to struggle with its effects today. Dyslexics often have difficulties with oral language, which manifests as a lack of glibness or oral fluency, as well as difficulty with rapid oral retrieval of words and difficulty coming up with a quick verbal response when questioned. Shaywitz's dyslexia affects his oral performance negatively—especially in testing situations in which his anxiety and arrhythmias compound the negative effect of his dyslexia.

Shaywitz alleges that the Board discriminated against him on the basis of his disability. Shaywitz's claim turns on whether he has a disability as defined by the ADA and whether the accommodation that he requests is a reasonable one.[2]

B. *THE BOARD CERTIFICATION PROCESS AND THE BOARD'S PART II ORAL EXAM*

The Board is a not-for-profit corporation that administers and maintains certifications in psychiatry, neurology, and several sub-specialties of psychiatry and neurology. Board certification is a critical mark of professional medical competence in the field of psychiatry. Certification is used by the public in selecting their physicians, by insurance agencies for reimbursements, and by hospitals, clinics, private practices, and health insurance companies as a prerequisite for hiring psychiatrists.

To be certified by the Board, a candidate must complete medical school, hold a medical license, satisfactorily complete the Board's specialized training requirements in psychiatry, pass a Part I written exam (the "Part I Written Exam"), and pass a second exam (comprised of an oral exam with an audiovisual part and a live-patient-examination part) (the "Part II Oral Exam"). Candidates must pass the Part I Written Exam before sitting for the Part II Oral Exam. The passing grade on the Part I Written Exam is valid for six years, and candidates are permitted three opportunities to pass the Part II Oral Exam in that six-year period.

In the fall of 2008, in response to some aspects of the Part II Oral Exam it found unreliable, the Board made a formal decision to eliminate the Part II Oral Exam. The elimination of the Part II Oral Exam completely eliminates the use of live patients and examiners to grade a candidate's performance. Beginning in 2011, most candidates for Board certification will take one single computerized certification examination, as the Part II Oral Exam will no longer be required for candidates who were in their first year of post-graduate training for psychiatry on or after July 1, 2007, or those who were in their second year of post-graduate training on or after July 1, 2008. But candidates, such as

---

**2.** This issue is relevant to the Board's 12(b)(6) motion and the Court therefore discusses it below at III.B.

Shaywitz, who entered post-graduate training prior to those dates must still pass both the Part I Written Exam and the Part II Oral Exam in order to be Board-certified.

## C. *SHAYWITZ'S INABILITY TO PASS THE PART II ORAL EXAM*

On November 5, 2003, Shaywitz passed the Part I Written Exam. He thereafter had six years and three attempts to pass the Part II Oral Exam. On three occasions—May 12, 2004, April 5, 2005, and May 6, 2007—Shaywitz sat for the Part II Oral Exam. He passed the standardized audiovisual portion, but failed the non-standardized, live-patient exam on each attempt. Consequently, he failed the Part II Oral Exam on each attempt.

Shaywitz had thus exhausted his three chances to pass the Part II Oral Exam and to be certified by the Board. The Board informed Shaywitz that in order to be certified, he would have to restart the certification process from the beginning and retake and pass both the Part I Written Exam and the Part II Oral Exam.

Sometime after May 25, 2007 (the exact date is unclear from the pleadings), Shaywitz appealed his Part II Oral Exam grade through the Board's internal appeal process. On August 15, 2007, the Board made its final decision to sustain Shaywitz's failing grade. Soon after, Shaywitz sought, through his attorneys, to have the Board reconsider its decision. On October 4, 2007, the Board, through its attorneys, refused that request.

On May 6, 2009, Shaywitz filed the instant suit, seeking, among other relief, an order directing the Board to certify him without his having to pass the live-patient aspect of the Part II Oral Exam.

## D. *SHAYWITZ'S EXCLUSION FROM THE BOARD–CERTIFIED MARKET*

Shaywitz also alleges that he seeks to compete in the market for the services of Board-certified psychiatrists, but that the Board has precluded him from competing in this market. He asserts that the Board's preclusion has prevented him from accessing the economic and professional advantages associated with Board certification, including increased job opportunities, wages, earning potential, and decreased costs to maintain his practice of psychiatry.

## II. *STANDING TO ASSERT ADA AND SHERMAN ACT CLAIMS*

### A. *LEGAL STANDARD APPLICABLE TO A 12(B)(1) MOTION TO DISMISS*

In reviewing a motion to dismiss, the Court should first address subject matter jurisdiction because, absent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further. *See Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir.2008) ("Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." (quotation marks and citation omitted)); *Can v. United States*, 14 F.3d 160, 162 n. 1 (2d Cir. 1994) ("[I]n most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider."); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case.").

The inquiry on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case. *See Arar*, 532 F.3d at 168. "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000); *see also Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("It is well established ... that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.").

## B. STANDING TO ASSERT ADA CLAIM

■ The jurisdiction of the federal courts under Article III of the Constitution extends only to actual "cases" or "controversies." U.S. Const. Art. III; *see Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Allen*, 468 U.S. at 750, 104 S.Ct. 3315 ("The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government."). "The requirement of standing ... has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *See Allen*, 468 U.S. at 751, 104 S.Ct. 3315.

■ The "irreducible constitutional minimum" of standing thus contains three elements: (1) the plaintiff must have suffered an "injury-in-fact," meaning an invasion of a legally-protected interest which is concrete and particularized, as well as actual or imminent, and not conjectural or hypothetical; (2) there must be a "causal connection" between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In its motion to dismiss the Complaint, the Board argues that Shaywitz fails to satisfy the first and third prongs of the *Lujan* standard. The Court finds, however, that Shaywitz has established by a preponderance of the evidence each of these prongs and therefore has standing to assert his ADA cause of action for injunctive relief.

### 1. Injury–in–Fact

■ Under the first prong of *Lujan*, Shaywitz must show that he has suffered an "injury-in-fact." 504 U.S. at 560, 112 S.Ct. 2130. To satisfy this test and thus maintain an ADA cause of action seeking injunctive relief to prevent future injury, "a plaintiff must allege[ ] facts giving rise to an inference that he will suffer future discrimination by the defendant." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir.2001) (emphasis added); *see id.* ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges ... a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." (quotation marks omitted)).

■ Shaywitz asserts that he (1) is presently injured and continues to be injured by the Board's refusal to certify him and (2) will also be injured in the immediate future upon re-application for the certification process because the Board will not waive its Part II Oral Exam requirement.

Shaywitz seeks—other than attorney's fees and legal costs and expenses—only an injunction as a remedy to prevent the Board from (1) continuing to not accept his Board-certification request or (2) refusing to certify him without his having passed the Part II Oral Exam (upon re-application for the Board certification process).[3]

 The Court finds that Shaywitz alleges facts sufficient to give rise to the inference that he will suffer real and immediate future discrimination by the Board. Shaywitz has requested Board certification at least three times. First, Shaywitz requested Board certification by undergoing the process of taking the Part I Written Exam and the Part II Oral Exam. Second, Shaywitz requested Board certification in his pre-suit demand on September 24, 2007. (*See* Compl. ¶ 39.) Third, Shaywitz presently requests Board certification through this suit. (*See* Compl. ¶ 56 ("Plaintiff is entitled to an injunction ordering Defendants [sic] to certify him."); *Id.* Prayer for Relief ¶ b. (requesting "[a] permanent injunction ordering Defendant to certify Plaintiff in the field of psychiatry").) The Court finds that Shaywitz sufficiently alleges that he faces ongoing and future (real and immediate) discrimination by Board.

Shaywitz will face future discrimination because he will need to gain Board certification in order to practice his profession at the level at which he would like to practice. The Board has made clear that it will not certify Shaywitz unless he can pass the Part II Oral Exam. It is reasonable to infer, based on Shaywitz's eagerness to be Board certified and practice psychiatry at the level at which he alleges he is capable, that Shaywitz would (if he did not think it futile) apply again to be Board certified and once again be told by the Board that he must take the Part II Oral Exam.

In *Camarillo v. Carrols*, 518 F.3d 153 (2d Cir.2008), a legally-blind plaintiff who frequented fast food restaurants sued the owners and operators of a smorgasbord of individual fast food restaurants (including the owners and operators of franchises of Burger King, McDonald's, Taco Bell, and Wendy's) under Title III of the ADA for their failure to accommodate her disability-related inability to read their menus. The plaintiff could read enlarged-text menus and could understand the content of the menus when read to her, but the defendants refused to provide enlarged-text menus or a reader. The defendants argued that the plaintiff had no standing to sue for an injunction under Title III of the ADA because she was not facing real and immediate future discrimination by defendants. The Second Circuit disagreed. It

3. The Complaint also requests that the Court "[a]ward Plaintiff full compensation for the damages it [sic] has sustained, on each of Plaintiff's claims for relief, in an amount to be determined at trial, and to be trebled according to law, plus interest." (Compl. Prayer for Relief ¶ d.) Based on the Court's reading of paragraphs 56 and 57 of the Complaint, along with paragraphs 58–68, and the request for damages to be "trebled" found in section (d) of the Prayer for Relief, the Court finds that Shaywitz is seeking money damages pursuant only to his Sherman Act causes of action.

If Shaywitz is in fact seeking money damages under his Title III ADA cause of action, the Court finds that he cannot recover them. A private plaintiff cannot recover money damages under Title III of the ADA. *See Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir.2004) ("Monetary relief, however, is not available to private individuals under Title III of the ADA. A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages." (citation omitted)); *Hunt v. Meharry Med. Coll.*, No. 98–7193, 2000 WL 739551, at *6 (S.D.N.Y. June 08, 2000)("[D]amages are ... not available to private plaintiffs under Title III.").

ruled that "it is also reasonable to infer, based on the past frequency of [plaintiff's] visits and the proximity of defendants' restaurants to [plaintiff's] home, that [plaintiff] intends to return to these restaurants in the future." *Id.* at 158; *see id.* (*citing Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137–38 (9th Cir.2002), for the proposition that "a plaintiff possesses standing to obtain injunctive relief under Title III of the ADA if she is aware of the defendant's discriminatory conditions; those conditions, and the plaintiff's awareness of them, are continuing; and the plaintiff plausibly intends to return to the place of discrimination").

Like the legally-blind plaintiff in *Camarillo*, Shaywitz (1) continues to be well aware of the Board's continuing discriminatory conditions, (2) plausibly intends to apply once again to be certified by the Board, and (3) would be denied the allegedly reasonable accommodation of bypassing the Part II Oral Exam requirement that he requested again. The likelihood of Shaywitz applying again for Board certification—given the great importance it carries for his career—further evidences the "plausib[ility of Shaywitz's] inten[tion] to return to the place of discrimination." *Id.*

The Board contends that Shaywitz does not show a likelihood of future injury because he does not allege that he intends to sit for Part I and Part II examinations again. Shaywitz is excused from any requirement of actually registering for the Part I and Part II exams again because it would be futile for him to do so. Shaywitz need only plead a plausible intention or desire to return to the place of alleged discrimination but for barriers to access of which he is aware. *See Access 4 All v. G & T Consulting Co.*, No. 06–13736, 2008 WL 851918, at *4 (S.D.N.Y. Mar. 28, 2008) ("Courts considering ADA claims have found that disabled plaintiffs who encountered barriers at public accommodations prior to filing their complaints have standing to bring claims for injunctive relief if they show *a plausible intention or desire to return to the place but for the barriers to access.*" (emphasis added)); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F.Supp.2d 160, 167 (S.D.N.Y. 2006) ("In the context of the ADA, awareness of discriminatory conditions, and the avoidance of a public accommodation because of that awareness, is injury in fact." (citations omitted)).

Cases in which courts dismiss ADA injunctive relief claims on standing grounds are markedly different from Shaywitz's action. Those cases generally involve plaintiffs who are unlikely to face "real and immediate" future discrimination. *See Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir.2001) (dismissing disabled plaintiffs' claims because they could not show an "immediate and real threat of future injury" because plaintiffs could not show that they would be denied the reasonable accommodations at issue again (i.e., entrance to the courthouse for one of the plaintiffs and a bed during a trial at the courthouse for the other plaintiff)); *Naiman v. New York Univ.*, No. 95–6469, 1997 WL 249970, at *5 (S.D.N.Y. May 13, 1997) (dismissing deaf plaintiff's ADA cause of action seeking an injunction on standing grounds because although plaintiff had visited defendant hospital four times for his condition, plaintiff had not established "real or immediate threat that he w[ould] require the services of [the hospital] in the future." (quotation marks omitted)); *Schroedel v. New York Univ. Med. Ctr.*, 885 F.Supp. 594 (S.D.N.Y.1995) (dismissing deaf plaintiff's ADA cause of action seeking an injunction on standing grounds because she failed to show that she faced a "real and immediate" threat of future discrimination at the hands of the defendant hospital); *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329 (N.D.Cal.1994) (dismissing deaf plaintiff's ADA cause of

action seeking an injunction on standing grounds because plaintiff, who spent only a few days a year in residence near the defendant hospital and who was at the hospital as a visitor and not a patient when the discriminatory conduct took place, was unlikely to return to the hospital again); *Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 830 (D.Md.1998) (dismissing deaf plaintiff's ADA cause of action seeking an injunction on standing grounds because plaintiff was unlikely to be injured by defendant hospital's failure to provide sign-language interpreters again); *Tyler v. The Kansas Lottery*, 14 F.Supp.2d 1220 (D.Kan.1998) (dismissing wheelchair-bound plaintiff's ADA cause of action seeking an injunction on standing grounds because plaintiff lived in Kansas when he filed suit under the ADA, but had since moved to Wisconsin and was thus unlikely to be injured in the future by lack-of-accessibility-related discrimination at lottery stores in Kansas); *Hoepfl v. Barlow*, 906 F.Supp. 317 (E.D.Va.1995) (dismissing HIV-positive plaintiff's ADA cause of action seeking an injunction on standing grounds because plaintiff was unlikely to again request surgery from the defendant surgeon who had discriminatorily refused her surgery, especially after plaintiff had moved to another state).

The Court finds that Shaywitz, unlike the plaintiffs in the cases cited above, has established by a preponderance of the evidence that he faces a very "real and immediate" threat of imminent future injury.

2. *Redressibility by a Favorable Ruling*

■ Under the third prong of *Lujan*, Shaywitz must show that his "injury will be redressed by a favorable ruling." 504 U.S. at 560–61, 112 S.Ct. 2130 (quotation marks and citation omitted). Shaywitz argues that his injury can be redressed by the Court's issuance of a permanent injunction ordering the Board to certify him. The Court need not decide on the pleadings whether the injunction directing the Board to certify Shaywitz without taking the Part II Oral Exam would be the appropriate remedy here, or whether injunctive relief directing some other accommodation would be more appropriate. For standing purposes, it is sufficient that Shaywitz has requested an injunction that would in fact redress his injury. The Court's conclusion that, if appropriate, an order directing the Board to certify Shaywitz would redress Shaywitz's injury is further bolstered by two considerations: (1) the Board having eliminated the live-patient aspect of the Part II Oral Exam, and (2) Shaywitz having passed all aspects of Board certification other than that now-eliminated aspect.[4] The Court finds that Shaywitz has established by a preponderance of the evidence that such an injunction would redress his injury.

C. *STANDING TO ASSERT ANTITRUST CLAIMS*

■ In addition to satisfying the "case or controversy" requirement of Article III of the Constitution, antitrust plaintiffs must establish antitrust standing. *See Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further

**4.** The Court addresses the related issue of (1) whether the remedy requested by Shaywitz (i.e., an injunction that orders the Board to certify Shaywitz without his having passed the live-patient aspect of the Part II Oral Exam) is a "reasonable accommodation" for the purposes of the ADA and (2) whether such an order would "fundamentally alter the nature of the service, program, or activity," below at section III.B.4.

determination whether the plaintiff is a proper party to bring a private antitrust action."); *Balaklaw v. Lovell,* 14 F.3d 793, 797 (2d Cir.1994) ("It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury.").

▮ A determination of whether a plaintiff has antitrust standing focuses on a two-pronged analysis. *See Balaklaw,* 14 F.3d at 798. First, the court must determine whether the plaintiff has established that he has suffered an "antitrust injury." *Paycom Billing Servs. v. Mastercard Int'l, Inc.,* 467 F.3d 283, 290 (2d Cir.2006). Second, the court must next determine whether the plaintiff has established that he is a proper party to bring the action. *Id.* at 290–91; *see also Daniel v. American Bd. of Emergency Med.,* 428 F.3d 408, 443 (2d Cir.2005). The Court finds that Shaywitz fails to establish either of these prongs.

1. *"Antitrust Injury"*

▮ A plaintiff has not established an antitrust injury when the aim of his lawsuit is to join the alleged cartel rather than disband it. *See Daniel,* 428 F.3d at 440 ("Assuming *arguendo* that the defendants' control over the supply of [ ]certified doctors does injure competition by restricting supply, plaintiffs cannot themselves state an antitrust injury when their purpose is to join the cartel rather than disband it." (citation omitted)).

In *Daniel,* the Second Circuit affirmed the district court's dismissal of antitrust claims against a certifying medical board because the plaintiff doctors did not plead an antitrust injury. *Id.* at 438–40. The plaintiffs in *Daniel* alleged that they were denied "the opportunity to command the same super-competitive pay earned by their [board]-certified colleagues," and sought an order from the court declaring them qualified to sit for the board-adminis-

tered certification examination. *Id.* at 439–40; *see also id.* at 438–39 ("Indeed, plaintiffs specifically plead their remuneration injury by reference to the difference between their own earnings and those of [board-]certified doctors.... In short, their theory of injury is not simply that [board]-certified doctors command super-competitive remuneration; their injury is the inability to do likewise."). The Second Circuit held that the plaintiffs could not plead an antitrust injury, stating:

> The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue. Whether the relief they seek is legal or equitable, plaintiffs must demonstrate that they themselves have sustained an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. In this regard, it has long and frequently been observed that the antitrust laws ... were enacted for the protection of *competition,* not *competitors.*

*Id.* at 438 (citations omitted) (quotation marks omitted).

Similarly, in *Sanjuan v. American Board of Psychiatry and Neurology,* 40 F.3d 247 (7th Cir.1995), the Seventh Circuit rejected antitrust claims by psychiatrists who sued the Board. In *Sanjuan,* the plaintiffs failed the Board's examination. Accordingly, the Board refused to certify the plaintiffs. The plaintiffs then sued the Board under the Sherman Act, requesting the Court to order the Board to certify them. *Id.* at 248–49. The Seventh Circuit affirmed the district court's dismissal of the plaintiffs' antitrust claims, stating that "[p]laintiffs, who want to obtain a credential that will help them charge higher prices, have pleaded themselves out of court on the antitrust claim." *Id.* at 252. The Seventh Circuit opined that

"[t]he claim that a practice reduces (particular) producers' incomes, has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Id.* at 251; *see also id.* (noting that "plaintiffs ... want to show injury to producers").

■ In the instant action, Shaywitz, like the plaintiffs in both *Daniel* and *Sanjuan*, has likewise "pleaded [himself] out of court on the antitrust claim[s]," *see Sanjuan*, 40 F.3d at 252, because he sues to show harm to producers rather than to consumers. Shaywitz seeks Board-certification in order to be admitted into the alleged antitrust conspiracy to increase his job opportunities, wages, earning potential, and the profitability of his practice. (*See* Compl. ¶ 50 ("The Board's anticompetitive conduct, which has precluded Shaywitz from competing in the market for the services of Board-certified psychiatrists, has directly and proximately caused Shaywitz to suffer injury by preventing him from obtaining Board certification and thus precluding him from all of the economic and professional advantages associated therewith."); *Id.* ¶ 14 (stating that the Board's exclusion of Shaywitz has caused him to "suffer[ ] from decreased job opportunities, lost wages, lost earning potential, and increased costs to maintain his practice of psychiatry."); *Id.* ¶ 47 (noting that the Board-certified psychiatrists are able "to charge higher rates to consumers").)

The narrow scope of Shaywitz's injunctive prayer further evidences Shaywitz's lack of antitrust injury. *See Daniel*, 428 F.3d at 440 ("The conclusion that plaintiffs do not state an antitrust injury is reinforced by the narrow scope of their injunctive prayer, by which they seek only to join rather than end the exclusive ... arrangement in order to acquire a share of the super-competitive profits."); *id.* at 440–41 ("In sum, by seeking relief that would permit them to join but not end the

alleged exclusive arrangement, plaintiffs make plain that they are not complaining of an antitrust injury."). Shaywitz's request for a "permanent injunction ordering Defendant to certify [him] in the field of psychiatry" makes clear that Shaywitz seeks to join rather than end the alleged exclusive arrangement. (*See id.* Prayer for Relief ¶ b.) Shaywitz notably does not seek to disband the Board or end its ability to exclude psychiatrists from gaining its certification. Accordingly, the Court finds that Shaywitz has failed to establish antitrust injury.

### 2. *The Antitrust Proper Party*

■ Even if the Court found that Shaywitz had suffered antitrust injury, Shaywitz still does not have antitrust standing because his claims fail the second prong of the inquiry. *See Daniel*, 428 F.3d at 443 ("Even if we were to conclude that the plaintiffs had adequately stated an antitrust injury, that would not necessarily establish their standing to sue in this case. 'A showing of antitrust injury is necessary, but not always sufficient,' to establish standing." (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986))); *see also Paycom Billing Serv., Inc. v. Mastercard Intern., Inc.*, 467 F.3d 283, 290 (2d Cir.2006) ("Even if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing.").

Shaywitz must still show that he is a proper party to bring the instant antitrust causes of action. Courts often refer to the "proper party" requirement as the "efficient enforcer" requirement. *Paycom*, 467 F.3d at 290–91 (noting that a private antitrust plaintiff must still show that he is an "efficient enforcer" of the antitrust laws).

■ One consideration in determining whether a party is the "proper party", or an "efficient enforcer" of the antitrust

laws, is "the presence of other efficient enforcers 'whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'" *Daniel*, 428 F.3d at 443–44 (*quoting Associated Gen. Contractors of Cali.*, 459 U.S. at 542, 103 S.Ct. 897). When "plaintiffs sue for both money damages and injunctive relief [this] factor raises particular standing concerns...." *Id.* at 443–44. The concern at issue is that the plaintiffs may "have no natural economic self-interest in reducing the cost of [the relevant type of] medical care to consumers." *Id.* at 444 (quotation marks omitted). This consideration is implicated when a plaintiff sues to gain the economic advantages of the alleged cartel. *See id.* at 443–44.

The Court finds that Shaywitz's economic self-interest is at odds with the interest of the antitrust laws to reduce the cost of psychiatric care to consumers, and that Shaywitz is not a proper party to bring the instant antitrust causes of action. Accordingly, the Board's motion to dismiss Shaywitz's Sherman Act causes of action is granted because Shaywitz fails to establish antitrust standing.[5]

### III. *PLAUSIBILITY OF SHAYWITZ'S ADA CLAIM*

#### A. *LEGAL STANDARD APPLICABLE UNDER RULE 12(B)(6)*

In addition to moving for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction, the Board also moves pursuant to Rule 12(b)(6) to dismiss Shaywitz's ADA cause of action for failure to state a claim upon which relief can be granted. The Court reviews the Board's motion under Rule 12(b)(6) under a distinct standard from the standard under which it reviewed the Board's motion under Rule 12(b)(1).

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff has failed to offer factual allegations sufficient to render the asserted claim plausible on its face. *See Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To state a facially-plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Publ. Offering Secs. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (quotation marks and citation omitted).

For the purposes of deciding a motion to dismiss, the Court accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Iqbal*, 129 S.Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (all reasonable inferences shall be drawn in plaintiff's favor). However, allegations that are no more than legal conclusions "are not entitled to the assumption of truth." *Iqbal*, 129 S.Ct. at 1950.

---

**5.** Because Shaywitz has not established antitrust standing, the Court will not analyze the merits of his claims under Sections 1 and 2 of the Sherman Act.

B. *APPLICATION TO SHAYWITZ'S ADA CLAIM*

Shaywitz asserts his ADA cause of action under Title III of the ADA. Title III provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation," 42 U.S.C. § 12182(a), and that "any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations ... in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals," 42 U.S.C. § 12189.

▆▆ In order for a plaintiff to establish a prima facie violation under the ADA, he must demonstrate (1) that he is a " 'qualified individual' with a disability"; (2) that the defendant is subject to the ADA; and (3) that he "was 'denied the opportunity to participate in or benefit from defendant['s] services, programs, or activities, or [was] otherwise discriminated against by defendant[ ], by reason of [his] disability.'" *Powell v. National Bd. of Med. Exam'rs.,* 364 F.3d 79, 85 (2d Cir.2004) (*quoting Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003)). The Board primarily focuses its argument on the first prong, contending that Shaywitz is not a "quali-

fied individual with a disability" under the ADA.

1. *Qualified Individual With a Disability*

▆▆ The first element that a plaintiff must demonstrate to state a prima facie cause of action under the ADA is that he is a "qualified individual with a disability." *See Powell,* 364 F.3d at 85. The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The ADA further defines the term "major life activities" to include "learning, reading, concentrating, thinking, communicating, and working." *Id.* Shaywitz alleges that he is dyslexic and that his dyslexia affects his oral abilities. (*See* Compl. ¶ 7.) Dyslexia, a learning disability, clearly falls under the rubric of disability as that term is defined by the ADA. *See, e.g., Bartlett v. New York State Bd. of Law Exam'rs,* 226 F.3d 69, 74–75 (2d Cir.2000); *Bartlett v. New York State Bd. of Law Exam'rs,* No. 93–4986, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001).[6] The Court finds that Shaywitz has adequately pleaded facts to establish that he is a "qualified individual with a disability."

2. *The ADA's Application to the Defendant*

The second element that a plaintiff must demonstrate to state a prima facie cause of action under the ADA is that the defendant is subject to the ADA. *See Pow-*

---

**6.** Shaywitz pleads that the disabling effects of his dyslexia are compounded by his extreme anxiety and fear of potentially-fatal cardiac arrhythmia brought on by stressful situations (such as an oral-exam situation). (Compl. ¶ 11.) These facts would further provide the Court with evidence that Shaywitz's dyslexia is a disability as that term is defined by the ADA. Shaywitz's Complaint and Opposition

Brief are somewhat unclear as to whether he is requesting the Court to order the Board to certify him because of both his anxiety and his arrhythmia (as distinct disabilities). The Court finds that Shaywitz pleads one disability in the Complaint, that of being dyslexic (albeit suffering from a dyslexia whose symptoms are compounded by his anxiety and arrhythmia).

*ell*, 364 F.3d at 85. By its terms, Title III of the ADA applies to entities that offer "examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes...." 42 U.S.C. § 12189. The Board concedes that its administration of an examination for professional certification subjects it to Title III of the ADA. The Court finds that Shaywitz has adequately pleaded facts sufficient to show that the Board offers examinations for professional certification and credentialing for post-secondary education, professional, or trade purposes. (*See* Compl. ¶¶ 14–16.)

### 3. *Denial of an Opportunity*

▮ The third element that a plaintiff must demonstrate to state a prima facie cause of action under the ADA is that the plaintiff "was denied the opportunity to participate in or benefit from defendant['s] services, programs, or activities, or [was] otherwise discriminated against by defendant[ ], by reason of [his] disability." *Powell*, 364 F.3d at 85 (quotation marks omitted). Shaywitz alleges that the Board's refusal to waive the passing of the Part II Oral Exam—an exam that Shaywitz was unable to pass because of his dyslexia (as compounded by his extreme anxiety and arrhythmias)—resulted in the Board's denial of the opportunity for Shaywitz to participate in and benefit from the Board's services, programs, and activities, by reason of his disability. (Compl. ¶¶ 34, 38–39, 42–43, & 50.)

The Court finds that Shaywitz has adequately pleaded facts to establish that he was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of his disability. The Court finds that Shaywitz has thus established a prima facie case under Title III of the ADA.

### 4. *Reasonableness of the Requested Accommodation*

Shaywitz requests (through both his pre-suit demand and through this action) Board certification without having passed the live-patient part of the Part II Oral Exam. (*See* Compl. ¶¶ 38, 56; *id.* Prayer for Relief ¶ b.) The Board argues that Shaywitz's requested relief is not a "reasonable accommodation" and that Shaywitz's ADA cause of action should therefore be dismissed.

▮ "A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." *Henrietta*, 331 F.3d at 282 (*citing Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). "All that plaintiffs must do at the motion to dismiss stage is plead the existence of a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *C.D. v. New York City Dept. of Educ.*, No. 05–7945, 2009 WL 400382, at *11 (S.D.N.Y. Feb. 11, 2009) (*quoting Meekins v. City of New York*, 524 F.Supp.2d 402, 409 n. 65 (S.D.N.Y.2007) and *Henrietta*, 331 F.3d at 280). Shaywitz's only specific request for an accommodation is for the Court to order the Board to certify him without his having passed the live-patient aspect of the Part II Oral Exam. (*See* Compl. ¶¶ 38, 56; *id.* Prayer for Relief ¶ b.) However, Shaywitz also adds a general request for "all other and further relief as may be appropriate, in law or in equity[,] to which [he] may be entitled." (*See id.* Prayer for Relief ¶ f.)

Whether total exemption from the live-patient part of the Part II Oral Exam is a "reasonable accommodation" under the ADA in these circumstances depends on the extent of Shaywitz's disability as a dyslexic as it relates to his oral performance in oral-testing situations. Whether

such an exemption is a "reasonable accommodation" also turns on the value and utility of the live-patient aspect of the Part II Oral Exam in the evaluation of candidates for Board certification. Shaywitz alleges that the Part II Oral Exam (including its live-patient aspect) has been generally eliminated (*see* Compl. ¶¶ 40–41) and that the live-patient part of the Oral Exam is of dubious value at best (*see* Compl. ¶¶ 17–22).

■ The Court finds both (1) the extent of Shaywitz's disability as it relates to his oral performance and (2) the value of the live-patient part of the Part II Oral Exam in evaluating candidates for Board certification are relevant questions of fact that presumably will be elucidated by the discovery process and, if appropriate, trial. At the pleading stage, Shaywitz has satisfied his burden.[7]

The Board also argues that it "need not make an accommodation at all if the requested accommodation would fundamentally alter the nature of the service, program, or activity." (Defendant's Reply Memorandum in Support of Its Motion to Dismiss the Complaint at 3–4 (*quoting Powell*, 364 F.3d at 86 (*quoting* 28 C.F.R. § 35.130(b)(7))).). *See also Henrietta*, 331 F.3d at 281.[8] Given Shaywitz's alleged competence and success as a medical student, resident, and fellow (*see* Compl. ¶ 13), and that the Board has largely eliminated its Part II Oral Exam (*see id.* ¶¶ 40–41), the Court finds it plausible that certifying Shaywitz without his having to pass the live-patient portion of the Part II Oral

Exam, based on the facts as alleged at the pleading stage, would not "fundamentally alter the nature of" the Board-certification process. Accordingly, the Board's motion to dismiss Shaywitz's ADA cause of action is denied.

## IV. *ORDER*

For the preceding reasons, it is hereby

**ORDERED** that the motion (Docket No. 5) of defendant American Board of Psychiatry and Neurology to dismiss the complaint is GRANTED in part and DENIED in part, and it is further

**ORDERED** that the parties confer and develop a proposed Case Management Plan to be presented for the Court's review at the initial conference in this matter, which is scheduled for January 15, 2010 at 9:30 a.m.

**SO ORDERED.**

---

7. The extent to which the Board's alleged violation of the ADA would call for some lesser accommodation (e.g., Court-ordered instructions to the live-patient examiner to take Shaywitz's disability relating to oral responses into account when evaluating his performance on the live-patient aspect of the Part II Oral Exam), is a question the Court need not reach at the pleading stage.

8. 28 C.F.R. § 35.130(b)(7) provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.*" (emphasis added).