**PAYCOM BILLING SERVICES, INC., Plaintiff–Appellant,**

v.

**MASTERCARD INTERNATIONAL, INC., Defendant–Appellee.**

**Docket No. 05–1845–CV.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 22, 2005.

Decided: Oct. 27, 2006.

Jeffrey I. Shinder (Gordon Schnell, Reiko Cyr, Jean Kim on the brief) Constantine Cannon, P.C., New York, NY, for Plaintiff–Appellant.

Jay N. Fastow (Bruce A. Colbath on the brief) Weil, Gotshal & Manges LLP, New York, NY, for Defendant–Appellee.

Before JACOBS, Chief Judge, WINTER, and WALKER, Circuit Judges.

WINTER, Circuit Judge.

Paycom Billing Services, Inc. ("Paycom") appeals from the dismissal of its complaint by Judge Trager in the United States District Court for the Eastern District of New York. The complaint alleges that three different policies adopted and practiced by MasterCard International, Inc. ("MasterCard") violate Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] These policies are MasterCard's imposition of penalties for charges denied by customers of, and failure to guarantee payment to, merchants who accept credit card charges without obtaining a signed receipt, its limitations on member banks' associating with competing credit cards, and rules limiting the participation of foreign banks in MasterCard's payment-card business. We conclude that Paycom lacks antitrust standing and has not sufficiently alleged concerted action. We therefore affirm.

## BACKGROUND

Because this is an appeal from a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), we view the allegations of the complaint in the light most favorable to appellant. *Leeds v. Meltz*, 85 F.3d 51, 52 (2d Cir.1996).

a) *MasterCard*

MasterCard is one of four major payment-card-network-service providers in the United States.[2] *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 234 (2d Cir. 2003) [hereinafter *"Visa II "*]. It operates a global card-payment-network that provides the infrastructure and network services for the authorization, clearance, and settlement of transactions effected with Master-Card-branded payment-cards. *Id.* at 235.

Organizationally, MasterCard is a membership association operated as an open

---

1. Paycom also asserted violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, but has abandoned these claims on appeal.

2. The other three payment-card network service providers are Visa U.S.A., Inc., American Express, and Discover. *United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322, 327 (S.D.N.Y.2001) [hereinafter *"Visa I "*].

joint venture, comprised of and owned by more than 20,000 member banks [3] who engage in the payment-card business for profit. *See id.; Visa I*, 163 F.Supp.2d at 332. MasterCard is funded primarily by service and transaction fees paid by its members, and the "organization['s] capital surpluses are held basically as security accounts, to pay merchants in the event a member bank defaults on a payment obligation." *Visa II*, 344 F.3d at 235. MasterCard is a "consortium[ ] of competitors.... owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions." *Id.* at 242. The consortium's members agree to abide by certain regulations and bylaws promulgated by the association. *Id.* at 235.

MasterCard members fall into one, or both, of two categories: (i) issuing banks, which disseminate MasterCard-branded payment-cards to individual cardholders and serve as the intermediary between the network and the cardholder; and (ii) acquiring banks, which contract with merchants to purchase transactions effected with MasterCard-branded payment-cards and serve as the intermediary between the network and the merchants accepting MasterCard payments. *Id.*

b) *Card–Present and Card–Not–Present Transactions*

For purposes of this proceeding, there are two distinct methods by which cardholders use their cards to purchase goods or services.

The first method is a face-to-face transaction in which a consumer physically presents a MasterCard-branded card to pay for goods or services from a "brick and mortar" merchant. We will call these "card-present" ("CP") transactions.

After the consumer produces the card, a series of electronic messages and transactions follows. The merchant sends the relevant information to its acquiring bank, which packages and processes that information and transmits it to the MasterCard network. The network sends this information to the cardholder's issuing bank, which approves or disallows the transaction based on the current validity of the card and the cardholder's available credit. This authorization or disallowance is sent via electronic message to the acquiring bank, which then sends it to the merchant. The purchase is then consummated or rejected. If consummated, the cardholder signs a receipt. The issuing bank bills the cardholder for the purchase amount and transmits the purchase price to the acquiring bank, deducting an "interchange fee," the fee the issuer charges to process the transaction. *Id.* The acquirer places these funds in the merchant's account after subtracting the fee for providing its services and executing the transaction, the "merchant discount." *Id.*

When a cardholder disputes a charge on his payment-card, the process is reversed by means of a "chargeback": the issuing bank requires the acquiring bank to return the funds, and the acquiring bank then usually deducts these funds from the merchant's account. To reverse a chargeback, a merchant must verify the validity of the transaction by producing the sales receipt signed by the cardholder at the point of sale. Upon providing such verification, the

---

**3.** Because certain distinctions between financial institutions have no bearing on the merits of this appeal, we refer to MasterCard members as "banks" even though many institutions that qualify for MasterCard membership are not, strictly speaking, banks. Most MasterCard member institutions, however, are indeed traditional banks. *See Visa II*, 344 F.3d at 235.

chargeback is re-presented for clearance through the network and the funds are restored to the merchant's account. Essentially, therefore, MasterCard guarantees payment to CP merchants that retain signed sales receipts reflecting the physical use of the card.

"Card-not-present" ("CNP") transactions differ in that the merchant never sees the card or cardholder but acquires the card number and/or other verifying information generally by phone or online. The ensuing sequence of electronic messages and authorization or disallowance are the same as CP transactions. CNP transactions disputed by cardholders are handled quite differently, however. A chargeback begins with the issuing bank receiving the funds back from the acquiring bank that in turn usually seeks the funds from the merchant, who has paid an unrefunded merchant's discount. Unlike the CP merchant, the CNP merchant must bear the loss—purchase price plus merchant's discount—because there is no signed receipt.

CNP transactions of course have a higher risk of fraud than CP transactions. It may be safer for thieves to use stolen cards by phone or online, and the occurrence of cardholders' falsely denying purchases is much higher than in the case of CP transactions.

Moreover, if a merchant client of an acquiring bank has excessive chargeback activity causing its "Chargeback Ratio"[4] to exceed a certain "Chargeback Threshold" defined by MasterCard, the acquiring bank is subject to fines and penalties.

### c) *Paycom*

Paycom is a merchant that sells access to password-protected websites ("customer websites") owned by independent entities that do not charge their consumers directly. A consumer wanting to purchase the services offered by a customer website—in Paycom's case, largely, but not exclusively, sexual or adult content websites that charge subscription fees to view materials on the website—is redirected from the customer website to Paycom's website. Once on Paycom's website, the consumer purchases the desired services from Paycom, e.g., monthly memberships, account IDs, and passwords that allow content to be viewed on the customer website. For payment, Paycom accepts MasterCard, Visa, and Discover payment cards, as well as automated clearing house transactions.

In serving as "payment processor" or "agent" for its customer website operators, Paycom is a merchant purchaser of MasterCard network services that has contracted with a MasterCard member acquiring bank directly. Under its merchant account with an acquiring bank, Paycom submits consumers' MasterCard transactions for authorization and payment. After receiving authorization and payment from the acquiring bank, Paycom credits the accounts of its customer websites in the amount of the transaction minus those fees Paycom charges for arranging the transaction. All purchases through Paycom are CNP transactions.

### d) *The Complaint*

On December 5, 2003, Paycom filed the present action in the Eastern District of New York challenging, *inter alia*, three MasterCard policies and practices: the chargeback system, the Competitive Programs Policy ("CPP"), and the "Cross–

---

**4.** A "Chargeback Ratio" is the ratio of MasterCard chargebacks received by a particular merchant in a given month to the total number and/or dollar volume of MasterCard sales transactions processed by that merchant in that month.

Border Acquiring Rules" ("CBA Rules").[5] Paycom alleged that each of these violated Section 1 of the Sherman Act. We describe these seriatim.

### 1. The Chargeback System

MasterCard's chargeback system is described in the complaint as follows. When a cardholder disputes a charge, the MasterCard issuing bank "typically" issues a chargeback to the acquiring bank. If the merchant fails to present a signed sales receipt, the acquiring bank "often" debits the entire amount from the merchant's account. This forces CNP merchants like Paycom to assume the risk of fraud because CNP merchants are not afforded the same payment guarantee as CP merchants that can produce signed sales receipts. CNP merchants are injured in this regard because they pay merchant fees for transactions for which they receive no benefit, as the transaction credit is removed from their account when a chargeback is issued.

Moreover, Paycom contends that MasterCard has imposed an arbitrary and onerous chargeback fine and penalty program that has resulted in Paycom's payment of substantial fines. Paycom alleges that the fine and penalty program results in a supracompetitive price that CNP merchants pay for fraud. Paycom claims that these chargeback policies have caused Paycom to incur substantial costs to combat fraud that could more readily be addressed by MasterCard itself. As such, output has been reduced because merchants like Paycom must take costly measures that combat fraud and turn away many honest consumers.

### 2. The Competitive Programs Policy

MasterCard instituted the CPP in 1996. *Visa II*, 344 F.3d at 236 & n. 3. Under the CPP, MasterCard member banks "may not participate either as issuers or acquirers" for any other competing payment-card network with the exception of Visa.[6] *Id.* Paycom alleges that the CPP allowed MasterCard to lock up virtually every bank in the United States and block competing payment-card networks, like those of Discover and American Express, from using the banking industry to distribute their payment-card services. Such a rule forced competing card networks to operate as single-issuer networks, limiting their transaction, issuance, and acceptance volumes. Paycom claims that the CPP thereby caused it harm by foreclosing competition in the market for network services and reducing the number of payment options available to Paycom. Other payment-card networks were therefore unable to discipline MasterCard through competition, leaving it free to impose higher interchange fees, onerous chargebacks, and more burdensome rules than it otherwise could have in the absence of the CPP.

To support its claims of antitrust injury, Paycom relies upon recent decisions that found MasterCard to be in violation of the antitrust laws. *See Visa II*, 344 F.3d at 243 ("In the market for network services . . . the exclusionary rules enforced by . . . MasterCard have absolutely prevented [American Express] and Discover from selling their products at all."); *Visa I*, 163 F.Supp.2d at 396 ("Not only issuers and card consumers but also merchants would benefit from an increase in competition

---

**5.** Paycom also challenged MasterCard's Internet Merchant Qualification Mandates but does not appeal from the dismissal of that claim.

**6.** Visa maintained a similar policy, by-law 2.10(e), which prevented Visa member banks from participating as issuers or acquirers for any other payment-card network with the exception of MasterCard. *Visa II*, 344 F.3d at 236 & n. 3.

among general purpose card networks, because merchants, as well as issuers, are consumers of network services.... Moreover, enhanced competition from American Express and Discover would likely cause defendants to be more responsive to the interests of merchants.").

### 3. The Cross–Border Acquiring Rules

The third challenge levied by Paycom relates to MasterCard's CBA Rules. Paycom contends that, under the CBA Rules, non-U.S. banks are prohibited from acting as acquiring banks for internet merchants' MasterCard transactions, limiting the number of acquiring banks with which Paycom can contract for the provision of MasterCard network services. Paycom alleges that the CBA Rules represent an unlawful market allocation scheme in which domestic banks are insulated from having to compete against foreign banks that might otherwise provide services to internet merchants.

## DISCUSSION

The district court dismissed Paycom's complaint in its entirety. This appeal followed.

### a) *Standard of Review*

We review *de novo* a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true and drawing all inferences in the plaintiff's favor. *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005). We will affirm a district court's dismissal where the plaintiff can prove no set of facts, consistent with its allegations, that would entitle it to the relief sought.

*See Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

These generous standards "appl[y] with no less force to ... Sherman Act claim[s]," *McLain v. Real Estate Bd.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), and "[n]o heightened pleading requirements apply in antitrust cases." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001). While motions to dismiss "[i]n antitrust cases in particular ... 'should be granted very sparingly,'" *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)), we do not "permit conclusory statements to substitute for minimally sufficient factual allegations." *Furlong, M.D. v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983).

### b) *Federal Antitrust Law*

"Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' th[e Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (citation omitted).[7] Some conduct is prohibited because it is deemed unreasonable *per se.* Other conduct is outlawed only after evaluation under the so-called "rule of reason." *Id.*

■ The *per se* label is applied "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). These "types

---

7. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

of restraints ... have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*" *State Oil,* 522 U.S. at 10, 118 S.Ct. 275 (citing *N. Pac. R.R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

■ Most antitrust claims, however, are evaluated under rule of reason analysis, "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil,* 522 U.S. at 10, 118 S.Ct. 275 (citations omitted).

■ While the Clayton Act's Sections 4 (damages) and 16 (injunctive relief), 15 U.S.C. §§ 15 and 26, permit private citizens to sue under the federal antitrust laws, private plaintiffs must demonstrate antitrust standing. *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 nn. 5–6, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Standing is required because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) [hereinafter "AGC"] (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)).

■ To recover, a plaintiff must show, *inter alia,* that it suffered an "antitrust injury." An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlaw-

ful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" because "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Id.* at 488, 489, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis added)); *see also Daniel v. American Bd. of Emergency Medicine,* 428 F.3d 408, 438 (2d Cir.2005) (citing cases). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (emphasis in original). A plaintiff must demonstrate antitrust injury whether the alleged violation is unreasonable *per se* or under the rule of reason, *id.* at 341, 344, 110 S.Ct. 1884, and whether it seeks damages or injunctive relief, *Cargill,* 479 U.S. at 110–13, 107 S.Ct. 484.

■ Even if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing. *See id.* at 110 n. 5, 107 S.Ct. 484 ("A showing of antitrust injury is necessary, but not always sufficient" to establish standing.); *Daniel,* 428 F.3d at 443. Other factors relevant to standing—sometimes referred to as the "efficient enforcer" factors—may "indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff." Id. at 443. These include: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the speculative-

ness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir. 1988) (quoting *AGC,* 459 U.S. at 540–45, 103 S.Ct. 897). "[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel,* 428 F.3d at 443 (citing *Sullivan v. Tagliabue,* 25 F.3d 43, 46 (1st Cir.1994)).

c) *Chargeback Claims*

Paycom contends that MasterCard's chargeback system violates the Sherman Act in two ways. First, it asserts that the refusal to grant CNP merchants a payment guarantee similar to that accorded CP merchants is the result of an unlawful conspiracy not to compete with respect to the costs or risks of CNP fraud and chargebacks. Second, it contends that the systematic imposition of chargeback fines and penalties reflects an agreement among MasterCard members to fix the price that merchants like Paycom pay for this fraud.

### 1. Lack of Antitrust Standing

■ Paycom's complaint does not allege that MasterCard requires chargebacks. Rather, each issuing bank is free to decide on its own whether to issue a chargeback. Moreover, the chargeback is against the acquiring bank, not the merchant. Compl. at 27 ("If the cardholder subsequently disputes the charge and submits the necessary paperwork to the issuing bank, the bank typically issues a chargeback to the acquirer."). The acquiring bank then decides on its own whether to assess the chargeback against the merchant's account. Compl. at 8 ("Within days [of receiving a chargeback], the acquiring bank *often* removes the full amount of the transaction from the merchant's account.") (emphasis supplied).

MasterCard's levy of chargeback fines and penalties for excessive chargeback activity are also assessed against the acquiring banks, not the merchants. Compl. at 29 ("Under MasterCard's rules, if a merchant's Chargeback Ratio exceeds the applicable Chargeback Threshold, MasterCard can impose substantial fines on the merchant's *acquiring bank.*") (emphasis supplied). "[T]hese fines and penalties are *almost* always passed along to merchants." Compl. at 29; *see also* Compl. at 50 ("acquirers *virtually* always pass these fines along to merchants") (emphasis supplied).

Paycom's situation is similar to that of the plaintiffs in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 742–47, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In that case, the purchasers of concrete blocks sued manufacturers of the blocks for price-fixing. *Id.* at 720, 97 S.Ct. 2061. The plaintiffs, however, had not been the direct purchasers of the concrete blocks; they purchased the blocks from general contractors, who in turn had bought the blocks from masonry contractors, who were the direct purchasers from the manufacturers. *Id.* The Supreme Court held that the plaintiffs did not have standing to pursue an antitrust action because they were indirect purchasers and the overcharges had simply been passed-on to them by the direct purchasers. *Id.* at 741–47, 97 S.Ct. 2061.

Paycom's complaint alleges that the chargebacks and chargeback fines and penalties are imposed by issuing banks and MasterCard on acquiring banks. Paycom is, therefore, in a position analogous to the indirect purchasers in *Illinois Brick.* To be sure, the acquiring banks are alleged "almost always" to pass-on these fees to the merchants. But, even if one hundred percent of the chargebacks,

fines, and penalties were passed-on, Paycom, as an indirect payor of the chargebacks and chargeback fines and penalties, would still lack antitrust standing. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

### 2. No Concerted Activity

■ Even if we viewed Paycom's claims as focusing on the conduct of the acquiring banks as horizontal competitors, the allegations of the complaint fail.

As to the chargeback/no-payment-guarantee conduct of the acquiring banks, an agreement among those banks to pass all costs of fraud back to CNP merchants would be a *per se* violation of Section 1. *See Visa II*. However, the incidence and costs of fraud in CNP transactions is greater than in CP transactions, and the alleged conduct of the acquiring banks with regard to CNP merchants alone does not constitute evidence, or a sufficient allegation, of an agreement. In fact, there is little difference between the acquiring banks' treatment of Paycom and commercial banks' treatment of merchants that accept personal checks drawn on non-existent or insufficient accounts. Those banks also "almost always" charge-back the losses due to bad checks to the merchant, and no one would regard an allegation of such conduct as reflecting cartel-like behavior.

■ While Paycom asserts the legal conclusion that acquiring banks have "conspired" not to compete with regard to the risks and costs of CNP fraud, the facts alleged show only largely parallel behavior

in response to the relatively higher costs of CNP transactions. Acquiring banks have to cover the costs of credit card business in charging merchants for credit card transactions, and the fact that increased CNP costs to acquiring banks are generally passed on to CNP merchants is hardly evidence of concerted conduct on the part of acquiring banks. From the acquiring banks' vantage point, the failure to pass back these costs would not only decrease their revenue but would also increase the risks of fraud by eliminating any incentive on the part of CNP merchants to limit it. Indeed, the allegation that the chargebacks are "often," "almost always," or "typically" passed on to CNP merchants suggests that competition for the business of particular CNP merchants exists, and that some acquiring banks may occasionally find it profitable to swallow the costs of fraud to retain a CNP merchant with a high level of business and/or low incidence of fraud.[8]

The missing element is an allegation that the acquiring banks pass these costs to CNP merchants because the banks have agreed jointly to do so. Nothing in Paycom's complaint sufficiently alleges that MasterCard rules or an agreement among acquiring banks have prevented Paycom from negotiating with acquiring banks to create an individualized solution to Paycom's costs of fraud. *Cf. Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 594, 600 & n. 13 (11th Cir.1986) (finding that Visa mandated interchange fees did not violate the Sherman Act when

---

**8.** Even if Paycom's assertion that Paycom "conspired" were adequate, it would, at most, allege a reduction of *intrabrand* competition, not *interbrand* competition. Indeed, the alleged agreement among MasterCard acquiring banks would offer competitors (like Discover and American Express) the ability to compete by offering merchants more favorable chargeback terms. A reduction in intrabrand competition is not sufficient to state an antitrust injury without some showing that "intrabrand competition was a critical source of competitive pressure," *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1573 (11th Cir.1983). Paycom has made no such showing.

individual acquirers and issuers were free to bypass Visa's rules and negotiate their own fees as long as they did not use Visa's computerized services). That omission is fatal. It is improper "to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *AGC*, 459 U.S. at 526, 103 S.Ct. 897.

#### d) *Paycom's CPP Claims*

▇ We have held that MasterCard's CPP violates Section 1 of the Sherman Act under a rule of reason analysis. *Visa II*, 344 F.3d at 234. Paycom's claim for damages resulting from the CPP is that, absent the CPP, American Express and Discover would have had access to MasterCard banks and would thereby have expanded the scope of their network services by increasing transaction/issuance volume. This increased competition from Discover and American Express would in turn have caused MasterCard to adopt policies more favorable to Paycom.

Even though we recognize that Paycom, as a consumer of payment card network services, *is a participant in the relevant market*, *id.* at 239 ("[I]n the market for general purpose card *network services*, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers."), we find that Paycom is not an "efficient enforcer," *Volvo N. Am. Corp.*, 857 F.2d at 66, and thus lacks standing to seek damages resulting from the CPP.

Paycom fails to satisfy any of the "efficient enforcer" factors.[9] First, the injuries claimed by Paycom are indirect. Competing payment-card network service providers like Discover and American Express were the entities directly harmed by the CPP. They were prevented from using MasterCard member banks to issue their payment-cards, thereby losing the substantial business that would have been enjoyed with a larger issuance and transaction volume. Any injuries suffered by Paycom from the CPP were derived from the reduced issuance/transaction volumes of Discover and American Express payment-cards. The CPP did not prevent Paycom from accepting Discover or American Express cards as payment options, and elimination of the CPP would have benefitted Paycom only through the increased use of Discover and American Express cards. Consequently, any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express. *See AGC*, 459 U.S. at 542, 103 S.Ct. 897 ("Partly because it is indirect, and partly because the alleged effects on the [Plaintiff] may have been produced by independent factors, the [Plaintiff's] damages claim is also highly speculative.").

Second, the extent of Paycom's losses caused by the CPP—or benefits from its elimination—are also highly speculative. No one can state that, absent the CPP, increased competition from Discover and American Express would have forced MasterCard to adopt policies more favorable to Paycom. Visa, a competitor on equal footing with MasterCard, while the CPP was operable, offered somewhat better terms to CNP merchants, yet that competition failed to affect MasterCard's policies regarding those merchants. Paycom's claim that MasterCard's policies would have been eliminated by the absence of the CPP is the sort of conclusory allegation held insufficient in *Furlong*.

---

9. Our analysis here assumes without deciding that Paycom has suffered the requisite "antitrust injury" also necessary for standing.

Further undermining its claim to standing is Paycom's failure to satisfy the second efficient enforcer factor. Paycom is not an entity whose self-interest would most "motivate [it] to vindicate the public interest in antitrust enforcement." *AGC,* 459 U.S. at 542, 103 S.Ct. 897. The justification for permitting Paycom "to perform the office of a private attorney general" is greatly diminished because "[d]enying [Paycom] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *Id.* Indeed, the plaintiff in *Visa I* addressed the exact violation now asserted by Paycom.

Moreover, the fourth efficient enforcer factor is not met here. If we were to allow parties such as Paycom to serve as a private attorney general in a suit for damages based on MasterCard's CPP, quantifying their damages would require wholesale speculation as to the extent and type of all of the various plaintiffs' injuries. It would be virtually impossible to apportion damages between Discover and American Express, which suffered direct injuries, and the millions of merchants, like Paycom, that conducted MasterCard transactions during the operation of the CPP and might have been indirectly harmed by the CPP. Moreover, the probability of duplicative recoveries would be very large.

Because Paycom fails to satisfy a single "efficient enforcer" factor, we hold that even if it suffered an antitrust injury, it has no standing to pursue such a claim.

e) *Paycom's CBA Rules Claims*

▮ Finally, we address Paycom's claim that it suffered antitrust injuries from MasterCard's CBA Rules, which pro-hibit foreign banks from providing acquiring services to internet merchants like Paycom.[10]

Paycom's CBA–Rules allegations fail to state an antitrust claim because none of the facts alleged even suggest that the CBA Rules have any anticompetitive effect on Paycom. As Paycom must and does concede, the market for banks offering acquiring services is very large and competitive. *Visa II,* 344 F.3d at 235 (MasterCard consists of over 20,000 member banks); *Visa I,* 163 F.Supp.2d at 332 (8,000 of Visa's 14,000 members are acquiring banks). Indeed, Paycom's complaint acknowledges that, in the Eastern District of New York alone, "[h]undreds of banks issue and/or acquire MasterCard credit and debit cards." With so many options available, the CBA Rules, while excluding some possible entrants, cannot impact competition in the market for acquiring services. As the Seventh Circuit has noted, "[t]he consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality." *Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 664 (7th Cir.1982). Without harm to competition, there can be no antitrust injury and, consequently, no antitrust standing. *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690.

Moreover, Paycom does not allege that absent the CBA Rules, foreign banks would actually enter the market for acquiring MasterCard transactions, or even that it has attempted to contract with a foreign bank. In fact, even with the CBA Rules in place, nothing prevents a foreign bank from establishing a domestic presence—

---

**10.** Because Paycom fails to state an antitrust injury or demonstrate antitrust standing with respect to its CBA–Rules claims, it is unnecessary to decide whether Paycom's claims that the CBA Rules create an unlawful "market allocation scheme" should be analyzed under rule of reason or *per se* analysis.

e.g., through purchase, merger, or acquisition—that would virtually ensure that the foreign bank could qualify as a Master-Card acquiring bank. *Visa I,* 163 F.Supp.2d at 332 ("MasterCard is open to any eligible financial institution."). Paycom has failed to give any reason whatsoever to believe that foreign bank acquirers would behave any differently from domestic acquiring banks. Thus, Paycom cannot claim that any "injury" is causally connected to the CBA Rules.

## CONCLUSION

For the reasons above, we affirm the dismissal of Paycom's complaint.