**18-175-cv**
*IQ Dental Supply, Inc. v. Henry Schein, Inc.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2018

ARGUED: SEPTEMBER 13, 2018
DECIDED: MAY 10, 2019

No. 18-175-cv

IQ DENTAL SUPPLY, INC.,
*Plaintiff-Appellant,*

*v.*

HENRY SCHEIN, INC., PATTERSON COMPANIES, INC., BENCO DENTAL
SUPPLY COMPANY,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 17-cv-4834 – Brian M. Cogan, *Judge.*

————

Before: WALKER, JACOBS, and POOLER, *Circuit Judges.*

————

This case involves allegations that three large dental-supply
distributors—Henry Schein, Inc., Patterson Companies, Inc., and

Benco Dental Supply Company, Inc. ("the Defendants")—conspired to violate the antitrust laws by engineering the boycott of an online distribution portal, SourceOne, Inc. ("SourceOne"), and dental manufacturers and suppliers associated with SourceOne. The Plaintiff, IQ Dental Supply, Inc. ("IQ"), is a competitor dental-supply distributor that sold dental products through SourceOne's online portals. IQ sued the Defendants in the United States District Court for the Eastern District of New York alleging violations of federal and state antitrust laws and asserting common law tort claims. The district court (Cogan, *Judge*) dismissed IQ's antitrust claims for lack of antitrust standing and IQ's tort claims for failure to state a claim. IQ appeals that decision.

We affirm the district court's dismissal of IQ's claim that it has antitrust standing to challenge the boycott of SourceOne and the state dental associations ("SDAs") that had partnered with SourceOne. As to IQ's claim that it has standing to challenge injury inflicted by the direct boycott of its business, however, we find that IQ's antitrust and tort claims may go forward on these direct boycott allegations only. Accordingly, we vacate in part the judgment of the district court and remand the case for further proceedings consistent with this opinion.

———

LAWRENCE FOX, Duane Morris LLP, New York, NY
(William B. Pollard, Amy C. Gross, Duane Morris

LLP, New York, NY; J. Manly Parks, Robert M. Palumbos, Duane Morris LLP, Philadelphia, PA, *on the brief*), *for Plaintiff-Appellant.*

RICHARD C. GODFREY, Kirkland & Ellis LLP, Chicago, IL (Barack S. Echols, Kirkland & Ellis LLP, Chicago, IL; Colin R. Kass, Adrian Fontecilla, Proskauer Rose LLP, Washington, DC; Bradley I. Ruskin, Proskauer Rose LLP, New York, NY, *on the brief*), *for Defendant-Appellee Henry Schein, Inc.*

James J. Long, Scott M. Flaherty, Briggs and Morgan, P.A., Minneapolis, MN, *for Defendant-Appellee Patterson Companies, Inc.*

Howard D. Scher, Thomas P. Manning, Samantha L. Southall, Buchanan Ingersoll & Rooney PC, Philadelphia, PA, *for Defendant-Appellee Benco Dental Supply Company.*

———

JOHN M. WALKER, JR., *Circuit Judge*.

This case involves allegations that three large dental-supply distributors—Henry Schein, Inc., Patterson Companies, Inc., and Benco Dental Supply Company, Inc. ("the Defendants")—conspired to violate the antitrust laws by engineering the boycott of an online distribution portal, SourceOne, Inc. ("SourceOne"), and of dental manufacturers and suppliers associated with SourceOne. The Plaintiff, IQ Dental Supply, Inc. ("IQ"), is a competitor dental-supply distributor that sold dental products through SourceOne's online portals. IQ sued the Defendants in the United States District Court for

the Eastern District of New York alleging violations of federal and state antitrust laws and asserting common law tort claims. The district court (Cogan, *Judge*) dismissed IQ's antitrust claims for lack of antitrust standing and IQ's tort claims for failure to state a claim. IQ appeals that decision.

We affirm the district court's dismissal of IQ's claim that it has antitrust standing to challenge the boycott of SourceOne and the state dental associations ("SDAs") that had partnered with SourceOne. As to IQ's claim that it has standing to challenge injury inflicted by the direct boycott of its business, however, we find that IQ's antitrust and tort claims may go forward on these direct boycott allegations only. Accordingly, we vacate in part the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

There are only a small number of dental-supply companies that distribute products to dental practices. Three of those companies, the Defendants, occupy approximately 80% of the dental-supply distribution market.[1] They purchase dental supplies and equipment from different manufacturers, and then sell the products to dental practices nationwide. This one-stop-shop model obviates the need for

---

[1] As we must at this stage, we take all of IQ's well-pleaded facts as true. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016).

dental practices to purchase their dental equipment from each manufacturer.

IQ is also a distributor of dental supplies, albeit one with considerably less market share than any of the Defendants. IQ entered the market in 2009. Beginning in 2014, IQ adopted a new distribution model. Instead of distributing dental supplies through the traditional method of deploying on-the-ground sales teams around the country (the model used by the Defendants) IQ distributed dental supplies through an online portal hosted by SourceOne.

SourceOne's online portal is a website where dental practices can purchase their supplies. SourceOne itself does not sell any dental supplies through the website but serves as the platform through which dental-supply distributors, such as IQ, sell products to dental offices. The distributors that used SourceOne's portals pay SourceOne a commission for each sale made through the website. In 2013, SourceOne launched additional distribution websites in partnership with the SDAs in Texas, Arizona, and Nevada. These SDA-specific sites operated much like SourceOne's own portal, but each SDA had its own unique domain name. SourceOne remitted a portion of their commission to the SDA for each sale made through an SDA-specific website.

IQ was not SourceOne's first distribution partner. Two other distributors—DDS Dental Supply and Arnold Dental Supply ("DDS and Arnold")—distributed products through SourceOne before IQ reached its agreement with SourceOne. But sometime around April 2014 both DDS and Arnold stopped selling through SourceOne because the Defendants pressured dental-supply manufacturers to stop supplying DDS and Arnold due to their arrangement with SourceOne. After losing DDS and Arnold as distribution partners, SourceOne tried to enlist a third distributor to supply dental products, but that distributor declined, allegedly because of the same anticompetitive behavior by the Defendants that had caused DDS and Arnold to withdraw.

SourceOne's need for a distributor to supply its online portals opened the door for IQ. In May of 2014, IQ signed a contract to distribute through SourceOne-affiliated websites, and, since then, IQ has supplied 90% of the dental supplies sold through SourceOne's website and its affiliated SDA websites. But IQ soon encountered the same problem that DDS and Arnold had faced: pressure from the Defendants intended to disrupt SourceOne's online sales portals began to affect IQ's business.

IQ alleged that the Defendants engaged in this campaign to force SourceOne out of business by conspiring to organize a boycott of: (1) SourceOne        and        SourceOne-affiliated        SDA        websites,

(2) participating SDAs and SDA trade shows, and (3) IQ directly by pressuring the manufacturers to stop supplying IQ. It also alleged that the Defendants engaged in a price-fixing conspiracy, which is not part of this appeal. These unlawful boycotts allegedly frightened off dental manufacturers, SDAs, and dental practices from doing business with companies connected to SourceOne, and, as a result, ultimately dealing with IQ. These boycotts "severely limited and inhibited IQ's growth and sales, and has cost IQ many millions of dollars in lost profits." Appellant's Br. at 13.

In August 2017, IQ sued the defendants in the Eastern District of New York, under the Sherman Act, 15 U.S.C. § 1, and corresponding state antitrust laws—the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*, and the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1 *et seq*. IQ also brought common-law claims for tortious interference with prospective business relations, civil conspiracy, and aiding and abetting.

The district court granted the Defendants' motion to dismiss IQ's complaint. It determined that IQ failed to establish antitrust standing because it had neither alleged an antitrust injury, nor shown that it was an efficient enforcer of the antitrust laws. The remaining state law claims were dismissed for failure to state a claim. IQ now appeals that decision.

**DISCUSSION**

We review the district court's grant of a motion to dismiss *de novo*; we accept as true all factual claims and draw all reasonable inferences in IQ's favor. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016). Questions of standing are also reviewed *de novo. In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009).

## I. Antitrust Standing

To survive the pleading stage, an antitrust plaintiff must demonstrate that it has "antitrust standing." *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436–37 (2d Cir. 2005). Only antitrust standing is at issue here. The antitrust standing requirement reflects the judgment that "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id*. (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 534 (1983)).

To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two things: (1) "that it suffered a 'special kind of antitrust injury,'" and (2) "that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Port*

*Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121–22 (2d Cir. 2007)). We address both these antitrust‑standing imperatives in turn.

**A. Antitrust Injury**

A plaintiff raising an antitrust claim must demonstrate antitrust injury to "'ensure[] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'" *Gatt*, 711 F.3d at 76 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).

Our jurisprudence culminating in *Gatt Communications, Inc. v. PMC Associates, L.L.C.* established a three‑part test for determining whether the plaintiff has alleged an antitrust injury: (1) the court "must 'identify[] the practice complained of and the reasons such a practice is or might be anticompetitive,'" *Id.* (quoting *Port Dock*, 507 F.3d at 122); (2)  the court must "identify the 'actual injury the plaintiff alleges' . . . [which] requires us to look to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct," *id.* (quoting *Port Dock*, 507 F.3d at 122, and *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 486 (1977)); and (3) the court compares the "'anticompetitive effect of the specific practice at issue' to the 'actual injury the plaintiff alleges,'" *id.* (quoting *Port Dock*, 507 F.3d at 122). IQ has adequately pleaded an antitrust injury in accordance with our decision in *Gatt*.

**1. *Gatt* Step One**

At the first step of the *Gatt* analysis, IQ need allege only that the Defendants have engaged in unlawful anticompetitive conduct. *Id.* The bar for such a showing is a low one. *See Port Dock*, 507 F.3d at 122. IQ has satisfied this requirement by plausibly alleging that the Defendants conspired to boycott the SourceOne-affiliated websites, the SDAs, and IQ itself, and engaged in a price-fixing campaign.[2] These allegations easily satisfy *Gatt*'s initial requirement that IQ allege unlawful anticompetitive conduct by the Defendants. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) ("Group boycotts . . . have long been held to be in the forbidden category [under the antitrust laws].").

**2. *Gatt* Step Two**

The second *Gatt* step requires us to isolate and identify IQ's "actual injury" or the "ways in which the plaintiff claims it is in a

---

[2] The district court dismissed IQ's price-fixing claims because competitors cannot claim injury from supracompetitive prices. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83 (1986) ("Nor can respondents recover damages for any conspiracy by petitioners to charge higher than competitive prices . . . . Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market prices . . . " (internal citations omitted)). IQ does not pursue a price-fixing antitrust conspiracy claim on appeal.

'worse position' as a consequence of the defendant's conduct." *Gatt*, 711 F.3d at 76.

The Defendants argue that IQ is in no "worse position" due to their conduct because the demise of DDS and Arnold provided IQ with the opportunity to do business through SourceOne. But for their alleged anticompetitive behavior, the Defendants claim, IQ would not have made a single sale through SourceOne's online portals—and therefore IQ cannot allege that it has been made any worse off than it would have been absent the Defendants' anticompetitive scheme. Essentially, the argument goes, every sale IQ has made through SourceOne-affiliated websites is a "bonus" sale that IQ would not have made in an undistorted market because DDS and Arnold would still be SourceOne's primary distributors, and IQ has not alleged that it would have partnered with SourceOne were that the case.

To support this argument, the Defendants rely on cases where courts have denied antitrust standing to a competitor that benefitted from a market distorted by anticompetitive conduct, *see Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (no antitrust standing for competitors who would benefit from a price-fixing conspiracy to raise prices); *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 319–20 (D.D.C. 2011) (no antitrust standing because an increase in market price did not harm competitors); *MacPherson's Inc. v. Windermere Real Estate Services Co.*, 100 F. App'x

651, 654 (9th Cir. 2004) (no antitrust standing because the alleged price-fixing scheme would increase the plaintiff's profits), and where courts have denied antitrust standing to a competitor that alleged it would have experienced an increase in its profits but for the anticompetitive conduct, *Alberta Gas Chemicals Ltd. v. E.I. Du Pont de Nemours and Co.*, 826 F.2d 1235, 1243 (3d Cir. 1987) (no antitrust standing for plaintiffs denied access to "windfall profits" as a result of antitrust conspiracy).

But the plaintiff's position in each of these cases is distinguishable from IQ's. In three of the cases—*Matsushita*, *MacPherson's*, and *Sprint*—the would-be antitrust plaintiffs enjoyed continuing benefits as a direct result of the antitrust violations. The plaintiffs in these cases were competitors benefiting from the supracompetitive pricing that the conspiracy had produced. *Matsushita*, 475 U.S. at 583; *MacPherson's*, 100 F. App'x at 654; *Sprint*, 821 F. Supp. 2d at 319–20. IQ, however, is not receiving a continuing benefit from the Defendants' alleged antitrust violations because the Defendants' conduct is not producing an ongoing competitive advantage for IQ.[3]

---

[3] The Defendants maintain that because their anticompetitive behavior is the but-for cause of IQ's agreement with SourceOne, any IQ sale made through SourceOne-affiliated websites constitutes an ongoing benefit to IQ. But the cases cited by the Defendants deny standing to plaintiffs who experience an ongoing beneficial market *condition* as a result of the defendants' conduct—not a one-time market opportunity. By contrast, the

Instead, IQ alleges that the Defendants' actions have decreased the number of sales it has been able to make through SourceOne-affiliated websites.

*Alberta Gas* is distinguishable for a different reason: in that case the plaintiffs claimed antitrust losses "stemming from the failure of a competitor to bring about an increase in demand and price." *Alberta Gas*, 826 F.2d at 1243. The Third Circuit held that a lost "windfall profit" is not an antitrust injury. *Id.* But IQ does not claim an actual injury based on the loss of windfall profits such as that disallowed in *Alberta Gas.* IQ's alleged losses do not stem from the denial of profits that would have resulted from an increased demand or new market absent the Defendants' anticompetitive conduct.

We agree with IQ that its role as a "replacement supplier" for SourceOne after the demise of DDS and Arnold does not defeat its claim of actual injury under the antitrust laws. Regardless of how IQ entered the market, once IQ was in the market it had a right to do business in a market undistorted by unlawful anticompetitive conduct. *See Brunswick*, 429 U.S. at 489 (plaintiffs must show that their injury is "of the type the antitrust laws were intended to prevent").

---

Defendants' ongoing boycotts have the continuing effect of restricting the number of sales IQ makes through SourceOne-affiliated websites.

Antitrust law is concerned with market conditions. *See Gelboim*, 823 F.3d at 773. Assuming that IQ is operating in a market affected by anticompetitive conduct, the question of actual injury becomes whether IQ is worse off than it would be if the market were free of anticompetitive forces. IQ has alleged that the Defendants' anticompetitive conduct affected the market, and that, after it entered the market, its sales through SourceOne suffered as a result. The manner of IQ's entrance into the SourceOne agreement notwithstanding, it is entitled to conduct its business in a market that is not infected with an anticompetitive distortion. Moreover, this is the type of injury the antitrust laws were designed to prevent. We conclude that IQ has adequately alleged an actual injury.

**3. *Gatt* Step Three**

Finally, at *Gatt*'s third step IQ must demonstrate that the Defendants' anticompetitive behavior caused its actual injury. *Gatt*, 711 F.3d at 76. IQ has satisfied this requirement. Assuming that IQ has suffered an actual injury as we determined in step two, there is no substantial dispute that IQ has adequately alleged that the Defendants' anticompetitive behavior caused the injury. *See Brunswick*, 429 U.S. at 489 (the plaintiff must show that the injury "flows from that which makes defendants' acts unlawful").

**B. Efficient-Enforcer Test**

Even if IQ has cleared the antitrust-injury hurdle, there is more to the antitrust standing requirement. An antitrust plaintiff must also show that it is an "efficient enforcer" of the antitrust laws. *Daniel*, 428 F.3d at 443.

A four-factor test is employed to determine whether an antitrust plaintiff is an efficient enforcer; thus we must evaluate: (1) "the directness or indirectness of the asserted injury," (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," (3) "the speculativeness of the alleged injury," and (4) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Id.* (internal quotations marks and citations omitted). These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case. *Id.*

To determine whether IQ is an efficient enforcer of the antitrust laws, we must first distinguish the different types of antitrust violations IQ seeks to enforce. There are three types of antitrust violations at issue in this appeal: organizing boycotts of (1) SourceOne-affiliated websites, (2) the SDAs, and (3) IQ. The first two violations allege instances of unlawful pressure placed on IQ's

business indirectly due to a boycott of SourceOne and the SDAs ("the indirect boycott allegations"), and the third violation alleges a direct boycott of IQ ("the direct boycott allegations").

### 1.     The Indirect Boycott Allegations

*Directness of the injury.* The first efficient-enforcer factor requires a direct injury: "Directness in the antitrust context means close in the chain of causation." *Gatt*, 711 F.3d at 78 (internal citation and quotation marks omitted); *see also Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (finding the plaintiff's injury too indirect when it "flowed from the injuries" suffered by other parties).

As to IQ's allegations that the Defendants engaged in an unlawful campaign to boycott the SourceOne-affiliated websites and the SDAs themselves, the violation is too remote to satisfy this first factor. We agree with the district court that IQ's claims with respect to these allegations are derivative and indirect: the harm to IQ resulted from injury to SourceOne and the SDAs.

To be sure, the infliction of a derivative injury does not always render an antitrust plaintiff's injury too indirect under the efficient-enforcer test. *See In re DDAVP*, 585 F.3d at 688 (derivative harm is sufficiently direct when "harming competitors [is] simply a means for the defendants to charge the plaintiffs higher prices"). Thus, in *In re*

*DDAVP*, the ultimate goal of the anticompetitive scheme to harm competitors was to charge the consumers higher prices. *Id.* at 682. By contrast, the Defendants here sought to put SourceOne—not IQ—out of business by undermining SourceOne's new and disruptive online sales model. IQ was not the target of annihilation; it was simply collateral damage.[4] IQ's alleged injury is therefore too indirect.

***Sufficiently motivated plaintiff.*** Under the second efficient-enforcer factor, IQ has failed to adequately allege that it is a sufficiently motivated plaintiff such that it is part of "an identifiable class . . . whose self-interest would normally motivate [it] to vindicate the public interest in antitrust enforcement." *Gatt*, 711 F.3d at 79 (quoting *AGC*, 459 U.S. at 542). In this case, several plaintiffs have already sued the Defendants and have alleged these same antitrust violations. *See SourceOne Dental, Inc. v. Patterson Cos., Inc., et al.*, No. 15-cv-05440 (BMC) (E.D.N.Y filed Sept. 21, 2015) (suit brought by SourceOne); *In re Dental Supplies Antitrust Litig.*, No. 16-cv-00696

---

[4] IQ argues that the district court erred by applying the "target area test." We abandoned that test over thirty years ago in *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292–93 (2d Cir. 1983). In any event, the district court did not apply the "target area test" when it found that IQ had not suffered a direct injury under the first efficient-enforcer factor. The "target area test" used to ask whether a plaintiff was within "that sector of the economy which is endangered by a breakdown of competitive conditions in the particular industry." *Id.* at 292 (internal quotation marks omitted). The district court did not ask that question. It properly asked whether IQ was a "target" of the Defendants' unlawful conspiracy in the context of assessing whether that injury was sufficiently direct.

(BMC) (E.D.N.Y. filed Feb. 9, 2016) (suit brought by dental offices). Although the existence of more-motivated plaintiffs is not dispositive, the presence of plaintiffs who are better situated to vindicate the antitrust laws is relevant to this second factor. *See In re DDAVP*, 585 F.3d at 688–89. With respect to the challenged boycotts, SourceOne is a better-positioned plaintiff than IQ because SourceOne has been more directly injured by the alleged antitrust conspiracy than IQ. And SourceOne has in fact sued the Defendants seeking to enforce the antitrust laws.

IQ argues that it is sufficiently motivated because none of the parties that have already sued (or could sue) the Defendants stand to recover lost profits. This is IQ's most promising claim that it is a properly motivated plaintiff: while SourceOne and the SDAs earn a commission on the sales, neither earns a profit. But this alone will not qualify IQ as a sufficiently motivated plaintiff. The antitrust laws recognize that "not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779. IQ's (highly speculative, as discussed below) lost profits do not tip the scales.

In short, "[t]he justification for permitting [IQ] 'to perform the office of a private attorney general' is greatly diminished because '[d]enying [IQ] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or

unremedied.'" *Paycom*, 467 F.3d at 294 (quoting *AGC*, 459 U.S. at 542). Given that IQ is further removed from the harm caused by the Defendants than the parties directly affected by the boycott that have already sued the Defendants, the second efficient-enforcer factor weighs against IQ's antitrust standing.

*Speculative Damages.* Under the third efficient-enforcer factor we must consider whether IQ's "asserted damages are speculative." *Gatt*, 711 F.3d at 76. Although "some degree of uncertainty stems from the nature of antitrust law," a high degree of speculation in a damages calculation suggests that "a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779.

The derivative nature of IQ's alleged injuries renders its potential recovery highly speculative. As the district court correctly ascertained, calculating IQ's damages essentially would require the creation of an "alternative universe." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, No. 17-cv-4834, 2017 WL 6557482, at *10 (E.D.N.Y. Dec. 21, 2017). IQ would have to model far more than basic lost sales and lost profits. It would need to first show how many additional SDAs would have partnered with SourceOne but for the Defendants' conduct, second demonstrate the types of agreements SourceOne and IQ would have had with each of those SDAs, and finally show how many SDA customers would have purchased IQ-supplied products through a SourceOne-affiliated website. Thus, IQ's damages

calculation rests on multiple layers of speculation. *See id*. ("Any damages estimate would require evidence to 'support a just and reasonable estimate of damages,' and it is difficult to see how appellants would arrive at such an estimate, even with the aid of expert testimony." (internal quotation marks omitted) (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988))). No amount of expert testimony can adequately ameliorate the highly speculative nature of IQ's alleged losses.

*Duplicative and difficult to apportion damages.* The fourth factor, duplicative recovery, also cuts against IQ. The damages to which IQ lays claim—lost profits from sales it would have made through SourceOne-affiliated websites absent the Defendants' anticompetitive conduct—are exactly the same damages SourceOne's initial suppliers, DDS and Arnold, could have claimed.

IQ argues that the potential for duplicative recovery has become irrelevant to the efficient-enforcer analysis because any antitrust claims DDS and Arnold might have against the Defendants are now time-barred. But we reiterate that the efficient-enforcer factors are concerned with finding the plaintiffs best suited to serve as "private attorney[s] general," *AGC*, 459 U.S. at 542, and not with identifying every plaintiff who might sue. Whether external or practical considerations (such as the statute of limitations) may eliminate a duplicative damages concern, therefore, is not substantially material.

The efficient-enforcer factor asks, in the overall scheme of antitrust enforcement, whether a potential antitrust plaintiff stands within that scheme as someone well positioned to enforce the antitrust laws. The existence of other plaintiffs who could lay claim to precisely the same damages, whether in theory or in actuality, indicates that the would-be antitrust plaintiff might not be well positioned to vindicate the antitrust laws for the benefit of the public. *See id.* Indeed, it would be strange and unworkable if new efficient enforcers sprang up simply by operation of the statute of limitations on the other enforcers.

In sum, we agree with the district court that because IQ is not positioned to efficiently enforce the claims that the Defendants harmed it by conspiring to boycott SourceOne-affiliated websites and the SDAs, IQ does not have antitrust standing to bring these claims.

### 2.     The Direct Boycott Allegations

IQ also alleges that the Defendants injured it by means of a direct boycott. IQ claims that the Defendants pressured the manufacturers to stop supplying IQ, frightened manufacturers away from supplying IQ in the first place, and otherwise disparaged IQ's business to its customers and potential customers.

We find, with respect to these particular allegations, that IQ is an efficient enforcer and thus has antitrust standing to proceed with its direct boycott claim against the Defendants.

*Directness of the injury.* The direct boycott injury IQ alleges is neither indirect nor derivative. IQ claims that the Defendants directly pressured manufacturers to stop selling their products to IQ, and that the Defendants sought to damage IQ's business reputation with its customers. Because IQ was the Defendants' target, these are direct injuries.

*Sufficiently motivated plaintiff.* Second, IQ is the most-motivated plaintiff with respect to the Defendants' alleged direct boycott of IQ. *See Gatt*, 711 F.3d at 78. Unlike the claims of injury from the indirect pressure on SourceOne and the SDAs, IQ is the "immediate victim[]" of any direct boycott of IQ. *AGC*, 459 U.S. at 541. It has suffered a direct loss of sales. By contrast, none of the plaintiffs best positioned to enforce IQ's claims of indirect boycott are well positioned to enforce IQ's allegations of direct boycott.

*Speculative damages.* The damages that flow from the Defendants' alleged direct boycott of IQ would not necessarily be speculative—such damages would relate to instances of potentially ascertainable business losses. The value of each lost opportunity might be calculated based on IQ's historical sales data without undue speculation.

*Duplicative recovery.* IQ's recovery of damages related to the direct boycott of IQ would not be duplicative. *See Gatt*, 711 F.3d at 79–

80. Unlike the indirect claims, any damages in connection with the Defendants' direct boycott of IQ could not also be claimed by Arnold and DDS. These injuries are specific to IQ alone.

The Defendants argue that IQ fails to state plausible claims for relief for direct injury because "the complaint does not contain factual allegations that Defendants engaged in any joint conduct to boycott IQ." Appellees' Br. at 55. This argument fails to recognize that the allegations of direct boycott are part of the Defendants' vast and multipronged attack on SourceOne's platforms, the SDAs, the distributors, and dental offices. In other words, IQ has not alleged that it has suffered an antitrust injury from the Defendants' direct boycott in isolation. Although, as the Defendants note, "complaints about price-cutters are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) (internal citation and quotation marks omitted), IQ's complaint here is not limited to price cutting. IQ has alleged that the Defendants, as part of their elaborate and extensive scheme to force SourceOne and associated entities out of business, exerted pressure on some of IQ's suppliers to boycott IQ.

***

In sum, IQ is an efficient enforcer of the antitrust laws solely with respect to IQ's allegations that it has been directly boycotted by the actions of the Defendants. As to these allegations, we vacate the district court's judgment and remand for further proceedings on IQ's claim.

**II.     IQ'S STATE LAW CLAIMS**

**A. New York and New Jersey Antitrust Claims**

IQ brought parallel antitrust claims under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*, and the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1 *et seq.* We decide questions of antitrust standing under both New York and New Jersey antitrust law in conformity with federal antitrust law. *Gatt*, 711 F.3d at 81–82 (holding that the Donnelly Act should generally be interpreted consistently with federal antitrust law (citing *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994))); *see also State v. Lawn King, Inc.*, 417 A.2d 1025, 1032 (N.J. 1980) ("[T]he New Jersey act is to be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." (internal quotation marks omitted)).

Therefore, our holding with respect to IQ's state law antitrust claims mirrors our federal antitrust holding discussed above. IQ's

indirect allegations—the boycott of SourceOne and the SDAs—fail because IQ is not an efficient enforcer. IQ's state-law antitrust claims that the Defendants directly boycotted IQ's business, however, may proceed.

### B.    IQ's State Law Tort Claims

Our final task is to determine the fate of IQ's remaining state law claims. IQ asserted common-law claims of tortious interference with prospective business relations, civil conspiracy, and aiding and abetting.

### 1.    Tortious Interference with Prospective Business Relations

Under New York law, a plaintiff claiming tortious interference with prospective business relations must "show the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair, or in any other way improper." *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir. 1987) (internal citation and quotation marks omitted), *abrogated on other grounds by Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998).  But where, as it does here, "the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." *Id.*

The district court dismissed IQ's tortious interference claim because IQ failed to allege a "viable antitrust claim" and therefore could not plausibly allege that it had suffered criminal or tortious behavior. Second, the district court determined, consistent with the efficient-enforcer analysis, that IQ had not plausibly alleged that the Defendants' conduct was the proximate cause of its injuries because IQ had suffered only indirect harm. Finally, with respect to IQ's allegations that the Defendants directly boycotted its business, the district court found them too "threadbare" to sustain a tortious interference claim.

We agree with the district court that IQ's claims of tortious interference with respect to IQ's allegations of indirect pressure by the Defendants (the boycott of SourceOne and the SDAs) should be dismissed because IQ failed to plausibly allege the underlying criminal or tortious conduct on which the tortious interference claim must be based.

We disagree with the district court, however, that IQ's claims of direct tortious interference are too scant to survive a motion to dismiss. As discussed above, IQ has plausibly alleged that it suffered an antitrust injury resulting from the Defendants causing a direct boycott of its business. Accordingly, this allegation is sufficient to allow IQ's tortious interference claim to proceed. Therefore, to the extent that the district court's dismissal of IQ's tortious interference

claim rested on a misapprehension of the distinction between IQ's claims of indirect and direct pressure on its business by the Defendants, the judgment of the district court is vacated and remanded to allow the tortious interference claims premised on the direct boycott of IQ to proceed.

### 2. Civil Conspiracy and Aiding and Abetting

IQ also asserted claims for state civil conspiracy and aiding and abetting.[5] Because IQ's civil conspiracy and aiding and abetting claims were derivative of its tortious interference claim, the district court dismissed these claims as tag-along claims. Consistent with our analysis above, we vacate in part the judgment of the district court as to these claims with respect to IQ's direct boycott allegations.

***

To recap, we conclude that while IQ has alleged an antitrust injury, it is not an efficient enforcer with respect to its allegations that the Defendants unlawfully caused the boycotts of SourceOne and the SDAs. We therefore affirm the judgment of the district court dismissing those claims. With respect to IQ's allegations that the

---

[5] We express no opinion at this stage as to the district court's finding that the existence of an independent tort of civil conspiracy in New Jersey did not raise a question of conflict of laws. IQ has properly pleaded a tortious interference claim from which its claim for civil conspiracy (under the law of either jurisdiction) can be derived.

Defendants directly brought about a boycott of IQ, however, we find that IQ is best positioned to enforce those antitrust violations. Accordingly, we vacate the judgment and remand the case to the district court on IQ's allegations of direct boycott only. IQ's state law antitrust claims and common law tort claims are also vacated and remanded, but only to the extent that they rely on IQ's allegations that it suffered harm as a result of the direct boycott.

## CONCLUSION

The judgment of the district court is AFFIRMED in part and VACATED in part. We REMAND this case to the district court for further proceedings consistent with this opinion.